UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

LUIS A. BONILLA,

                                        Plaintiff,

            - versus -

CAROLYN W. COLVIN,
  Acting Commissioner of Social Security,

                                        Defendant.

MEMORANDUM
AND ORDER
15-CV-3264 (JG)

APPEARANCES:

        LUIS A. BONILLA
                82-01 Hammels Boulevard
                Apartment 4E
                Far Rockaway, NY 11693
        By:    *Plaintiff pro se*

        ROBERT L. CAPERS
                Acting United States Attorney
                Eastern District of New York
                271 Cadman Plaza East
                Brooklyn, NY 11201
        By:    Rukhsanah L. Singh
                *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

            On June 3, 2015, Luis Bonilla brought this action against the Commissioner of

Social Security ("Commissioner") pursuant to 42 U.S.C. § 405(g).  Bonilla seeks review of the

Commissioner's final decision dated November 14, 2014, which found that he was not disabled

and therefore not entitled to disability insurance benefits or Supplemental Security Income

("SSI") as provided for in Titles II and XVI of the Social Security Act ("the Act").  The

Commissioner has moved for judgment on the pleadings, seeking an affirmation and dismissal.

Bonilla seeks modification of the Commissioner's decision to include monthly maximum

insurance and/or SSI benefits retroactive to the date of his initial disability, or, in the alternative, remand to the Commissioner for reconsideration of the evidence. I heard oral argument on October 9, 2015. For the reasons that follow, the Commissioner's motion is denied and Bonilla's case is remanded for further proceedings consistent with this opinion.

BACKGROUND

A.    *Procedural History*

Bonilla applied for SSI on December 12, 2012, claiming disability as of September 1, 2011 due to scoliosis[1] and severe back pain, as well as seizures since birth and hypertension. R. 67, 70, 143.[2] The Commissioner denied his application on March 21, 2013. R. 76, 89. Bonilla then requested and received a hearing before an Administrative Law Judge ("ALJ") on October 29, 2014. R. 25-65, 81. Bonilla, who was represented by appointed counsel, R. 92-93, testified at the hearing. R. 27-65. Also present and testifying were Dr. Leslie Fine, who conducted a consultative psychiatric exam of Bonilla; Dr. Chaim B. Eliav, who conducted a consultative physical exam; and Peter A. Manzi, a vocational expert. R. 49-65.

On November 14, 2014, the ALJ found that Bonilla was not disabled within the meaning of the Act because he retained the residual functional ("RFC") to perform light work, as defined in 20 C.F.R. 416.967(b), with a five-minute break every hour. R. 12-19. The ALJ stated that a significant number of jobs in the national economy would meet Bonilla's needs and match with his age, education, and work experience. R. 18. The Appeals Council denied Bonilla's

---

[1]    "Scoliosis is a lateral (toward the side) curvature in the normally straight vertical line of the spine. When viewed from the side, the spine should show a mild roundness in the upper back and shows a degree of swayback (inward curvature) in the lower back. When a person with a normal spine is viewed from the front or back, the spine appears to be straight. When a person with scoliosis is viewed from the front or back, the spine appears to be curved." *Scoliosis – Topic Overview*, WebMD, http://www.webmd.com/osteoarthritis/guide/arthritis-scoliosis.

[2]    Citations in the form "R. __" refer to pages of the administrative record. ECF No. 8.

request for review on April 6, 2015, rendering the ALJ's adverse decision the final decision of the Commissioner.  R. 1.

B.    *Bonilla's Description of His Medical Condition*

Bonilla is 23 years old; he was born on May 30, 1992.  R. 67.  At the time of his application for SSI, he was 5'6" tall and weighed 120 pounds.  *Id.*  Bonilla lives with mother and father in an apartment in Far Rockaway, Brooklyn.  R. 28.  Aside from a two-month period in 2013 when he resided with a "girl cousin,"[3] R. 45-46, 132, 204, 208, Bonilla has not reported living in any arrangement besides at his parents' home.  He has a high school education, which he completed in "regular ed."  R. 28.  Bonilla testified that he would have wanted to attend college, but that he did not because "[i]t never occurred to [him]."  R. 29.  On February 1, 2013, Bonilla completed a "Function Report" and wrote that he spent his days going to school and then coming home.  R. 158.  Bonilla testified that he now mostly stays at home and watches TV "in bed rest."[4]  R. 30, 42.  It is undisputed that Bonilla does not have any prior work experience that is relevant for the purposes of determining his eligibility for SSI.  R. 60; Resp. Br. at 2; *see also infra* at 5-6 (discussing prior work experience).

Bonilla applied for SSI stating that he is limited in his ability to work due to scoliosis, severe back pain, epilepsy, hypertension, and memory loss.  R. 70.  Of these

---

[3]    The nature of Bonilla's relationship with this cohabitant remains unclear.  On March 7, 2013, Dr. Robert Lancer, who conducted Bonilla's consultative psychiatric exam, reported that he "resides with his girlfriend." R. 204.  On January 18, 2013, Bonilla stated in his SSI application that he had moved in with a woman named Alejandra Lizbeth Castellon on November 1, 2012, and added, "We present ourseves to others as husband and wife." R. 132.  At a consultative examination on March 7, 2013, Bonilla reportedly told the examining doctor that he "lives with his sister." R. 208.  However, at his October 2014 hearing, Bonilla clarified that he never lived with a girlfriend as he has "never had a girlfriend," but had instead resided with a "girl cousin" for "a couple months."  R. 45-46.

[4]    When the ALJ asked Bonilla why he needs bed rest, he responded, "I can't really do much.  I can't – if I walk a lot, my back, you know, starts hurting."  R. 30.

conditions, the back pain Bonilla suffers as a result of his scoliosis and the seizures he has endured since childhood are the primary bases for his claim of disability. R. 67, 70, 143.

      1.    *Scoliosis and Back Pain*

Bonilla has scoliosis in the "lower and top right" of his spine. R. 30. The misalignment of his spine creates "severe back pain," R. 67, which he feels "all the time," R. 165. Due to the pain, he cannot sleep regularly or play sports. R. 158. Most troublingly, Bonilla has reported, his scoliosis both hinders his ability to remain in the same position for long and to change positions easily. R. 162-63. When he "stand[s] for long, [he] get[s] back pain," and the same thing happens when he climbs stairs, kneels, squats, or sits. R. 162-63. Bonilla testified that he "can't sit down all day," but indicated that he might be able to sit for three hours and then take a break and sit for another hour. R. 33. Even with breaks, however, he believes he probably could not sit for five or six hours in a day. R. 34. During the breaks, walking around is usually insufficient, as he has "to lay down most of the time." *Id.* Bonilla explained that he has to lay down because his "back gets cramped up, and it gets like stiff" and he gets short of breath if he stands for too long. R. 34-35. Bonilla testified that his "left side is more down[, s]o there's pressure on [his] heart," resulting in the shortness of breath. R. 35. He said, "I'll stand up for like two or three hours and then just lay back down most days." *Id.* But even when he lays down, he said, "I can't lay on my left side because I feel like I can't breathe." R. 36.

In the Function Report, Bonilla wrote that he "can't lift," and when he reaches for things, he "get[s] pain." R. 163. The ALJ asked Bonilla a series of questions about how much weight he could probably lift with his left hand, his right hand, and both hands together. R. 32-3. Bonilla stated he does not exercise, go to a gym, or work out at all. R. 32. In addition, he had "really never tried" lifting anything with both hands. *Id.* Nevertheless, in answer to the ALJ's

question, "Can you lift 40 pounds?," Bonilla stated, "With my left hand I probably could." *Id.* He then amended his answer by saying, "My left hand about 20 pounds, about 20 pounds." *Id.* Later, he said he could lift 30 pounds with his left hand. R. 33. Bonilla estimated that he could probably lift 40 pounds with both hands. *Id.* He explained that he is "more weak on [his] right side." R. 32.

Regarding his ability to walk, Bonilla wrote in the Function Report that he can walk for about four blocks before needing ten minutes to rest and recoup. R. 164. Bonilla testified at his hearing that he could walk about three or four blocks in one direction, and agreed when the ALJ asked whether this meant six to eight blocks round-trip. R. 33.

As a result of these limitations, Bonilla said he "can't do much" to help around the house because "[his] back hurts to[o] much." R. 160. He testified that he does some "light stuff" around the house, including washing the dishes and making his bed. R. 42-43. Sometimes, he cooks "small stuff" for himself and shops for his clothes around his neighborhood. R. 42-43. The scoliosis makes it difficult for Bonilla to lift big pots and pans or stand "for long," so typically his father prepares his meals or he eats canned food. R. 159-60.

Bonilla testified that his only two jobs were during high school, when he stocked shelves and received deliveries at a supermarket for two months in 2010, R. 30-31, and when he worked as a line cook and cashier at a Popeye's restaurant in 2011. R. 38, 73. He said the Popeye's job was a temporary summer position,[5] R. 38, but he was unable to hold the first job due to his back pain. R. 31. Bonilla testified that the managers at the supermarket "let me go

---

[5]     In his consultative psychiatric evaluation, Dr. Lancer noted the following regarding Bonilla: "Last employed in 2011 at Popeye's. He held the job nine months. He left due to back pain." R. 204.

because they seen [sic] how I was working.  Working stock, you have to lift heavy stuff.  [They saw] how I was working slow.  I couldn't really lift heavy – lift much stuff." *Id.*

Despite his back condition, Bonilla has reported that he can take care of himself in general, and that he dresses, bathes, and uses the toilet independently.  R. 158-59.  He can see, hear, and speak without impairment.  R. 163.  He does not socialize much, but goes to church once a week and talks to others on the phone.  R. 162.  There is no indication that Bonilla has problems reading or understanding instructions.  R. 164.  He has, however, stated that he sometimes has trouble remembering things.  R. 165.

Bonilla testified that he has not taken medication for his back pain.  R. 167.  He did state, however, that his primary care physician, Dr. Kyi Win Yu, prescribed him a back brace, and that he stopped wearing it because it "put too much pressure on [his] back."  R. 42; *see also* R. 167 (stating "I can't wear ti[ght] clothes on my back.").  Dr. Yu has reportedly told Bonilla that he needs "immediate surgery" for his scoliosis "because it's going to be growing and growing."  R. 42.  In his SSI application, Bonilla noted that he does not have health insurance.  R. 134.

2.     *Epilepsy*

Regarding his epilepsy, Bonilla testified that, "seizures come in my life on and off."  R. 168.  The last two seizures he had before his SSI application were on July 7, 2010 and December 22, 2011.  R. 169.  Bonilla testified at his hearing that his last seizure was six months prior, which would have been around April 2014.  R. 39.  His seizures last 15-20 minutes, and afterwards his blood pressure decreases and he feels "very tire[d]."  R. 168.  Bonilla's seizures cause him to shake, pass out, and urinate on himself.  R. 39-40.  Sometimes the results are more "dramatic;" in one incident, Bonilla stated, "I cracked my chin."  R. 40.

Bonilla's epilepsy limits his ability to drive a car or go out alone.  R. 160-61.

Bonilla testified that because he cannot go outside much, he buys things online, including food

and clothes.  R. 161.  He gets around with help from his father, who drives him, or by using

public transportation.  R. 28-29, 161.

Bonilla stated in his Function Report that he has seen a doctor about his seizures,

but that the doctor said he was too young for epilepsy medication.  R. 167-68.  On the dates of

his two most recent seizures prior to submitting his SSI application, Bonilla underwent tests at

Peninsula Hospital.  R. 167.  At the hearing, Bonilla testified that he does not take epilepsy

medication and has not seen a neurologist.  R. 40-41.

The ALJ asked Bonilla questions that suggested a connection between his alcohol

consumption and his seizures,[6] but Bonilla emphasized that he has had seizures since birth.  *Id.*

Bonilla testified that he had been sober for one year and does not use drugs.  R. 36-8.  He said he

was admitted to a hospital in October 2013 for alcohol intoxication, but had not had a drink since

then.  *Id.*

C.      *The Medical Evidence*

1.      *2009-2012: Medical Evidence Prior to the Alleged Onset Date*

On May 5, 2009, a doctor at St. John's Episcopal Hospital South Shore ("St.

John's") performed a scoliosis series on Bonilla.  R. 253.  He reported that "[t]here is a S-shaped

scoliosis of the lumbar spine."  *Id.*  The convexity of the thoracic[7] component of Bonilla's spine

---

[6]      "Q  Did the alcohol help bring [the seizures] on do you think?
A No.
. . .
Q You think the seizures are related to the alcohol use?
A  No, I've had seizures ever since I was little."  R. 40.

[7]      The spine consists of four regions.  *Understanding Spinal Anatomy: Regions of the Spine –
Cervical, Thoracic, Lumbar, Sacral*, Colorado Spine Institute, http://www.coloradospineinstitute.com/subject.php
?pn=anatomy-spinalregions14.  The neck region is called the "cervical spine" and the vertebrae are numbered C1

was to the right, measuring 40 degrees centered at T8-T9.  *Id.*  The convexity of the lumbar

component was to the left, measuring 40 degrees centered at L2.  *Id.*  Bonilla's heart and lungs

appeared normal.  *Id.*

Bonilla saw Dr. Yu, his primary care physician, on September 21, 2009 for knee

pain.  R. 222-23.  Bonilla was assessed for scoliosis and referred to orthopedic surgery.  R. 222.

On September 22, 2009, Bonilla attended the orthopedic clinic at St. John's.  R. 408-09.  He was

assessed with scoliosis at T1-T8.  R. 409.  The doctor requested a consultation to determine

whether surgery was necessary.  *Id.*  A doctor wrote Bonilla a prescription on October 17, 2009

exusing him from work between October 18, 2009 and October 23, 2009 "because of acute

weakness to lower back."  R. 180.

On December 10, 2010, Bonilla was admitted into the emergency room at

Peninsula Hospital.  R. 181-86.  Doctors performed a toxicology screen (negative), R. 184, blood

tests (elevated carbon dioxide, lactate dehydrogenase, total protein, white blood cells, and

monocytes; low lithium, sodium, chlorides, cholesterol, neutrophils, and eosinophils), R. 185,

and an electrocardiogram (unconfirmed).  R. 186.  Doctors applied dermabond to Bonilla's chin.

R. 181.  He was given a prescription for Keflex, R. 181, and told to follow up with Dr. Yu for a

neurology referral.  R. 182.

On February 23, 2012, Bonilla went to Dr. Yu for back pain.  R. 242-43.  Dr. Yu

assessed Bonilla for scoliosis and referred him for x-ray imaging.  R. 242.  The x-rays, taken on

On March 2, 2012, showed that Bonilla had thoracic scoliosis concave towards the left with apex

---

through C7.  *Id.*  The "thoracic spine," including vertebrae T1 through T12, comprises the upper back area.  *Id.*  The lower back region is called the "lumbar spine," and the vertebrae are numbered L1 through L5.  *Id.*  Finally, the "sacrum" is five bones, S1 through S5, that are fused together and fit between the two hip bones connecting the spine to the pelvis.  *Id.*

at T8.  R. 187.  The scoliosis measured 53 degrees.  *Id.*  There was a rotational component at the apex of grade 3 out of 4.  *Id.*  The Risser grade was 4.[8]  *Id.*  On March 17, 2012, Dr. Yu wrote Bonilla a referral for spine surgery.  R. 244.

Bonilla consulted Dr. Yu on March 27, 2012 for a general check up for scoliosis and sexually transmitted diseases.  R. 189-90.  Dr. Yu reported that Bonilla's right scapular was higher than his left.  R. 189.  Dr. Yu screened Bonilla for venereal diseases, diabetes, anemia, and conducted other tests.  *Id.*  The doctor assessed  Bonilla for  "episodic drug abuse," but noted that Bonilla said he had not used drugs in the past year except for prescription medication.  *Id.*  Bonilla had also stated he had not had an alcoholic drink in the past year.  *Id.*  Dr. Yu referred him to a spinal surgeon.  R. 190.

On June 10, 2012, Bonilla was admitted to the St. John's emergency department.  R. 256-64.  He had been pepper-sprayed by the police and appeared due to eye pain, blurriness, and facial numbness.  R. 256, 262.  Bonilla arrived in an ambulance accompanied by law enforcement.  R. 256.  His eyes were irrigated with normal saline prior to discharge.  R. 262.

2.    *2012-2014: Medical Evidence After the Onset Date*

On December 23, 2012, Bonilla was admitted to the St. John's emergency department for alcohol intoxication.  R. 193-203, 267-308.  He arrived in police custody.  R. 194.  Doctors conducted a physical examination, and he appeared normal.  R. 202-03.  A psychiatrist also evaluated Bonilla, and he was found to be stable for discharge.  R. 194, 200.

---

[8]         "Most physicians agree that by the time 'Risser 3' the patient has passed the peak of the 'growth spurt' (a period of rapid spinal growth during which Scoliosis curves can increase rapidly)."  *Rissers Sign*, Scoliosis Nutty, http://www.scoliosisnutty.com/rissers-sign.php.

On February 20, 2013, Bonilla visited Dr. Yu about his scoliosis. R. 247-48. Dr. Yu reported that Bonilla had scoliosis and that "the shoulder is high." R. 247. He stated that Bonilla should follow up regarding spine surgery. *Id.*

On March 7, 2013, Dr. Robert Lancer performed a psychiatric evaluation of Bonilla at the Commissioner's request. R. 204-07. Dr. Lancer noted that Bonilla "resides with his girlfriend" and "took a bus approximately 2-1/2 hours to get to the evaluation." R. 204. The doctor also included in his report that Bonilla was last employed at Popeye's for nine months in 2011, and that he left "due to back pain." *Id.* Regarding Bonilla's current functioning, Dr. Lancer stated that Bonilla "frequently wakes up[,] approximately three times a night." He added that "[d]ue to physical limitations, he does not do the cooking, cleaning, or laundry. He shops, manages money, and takes public transportation." R. 205. Dr. Lancer found no diagnosis along Axis I[9] or Axis II, but noted high blood pressure and seizures along Axis III. R. 206. In conclusion, Dr. Lancer stated that "[t]he results of the examination do not appear to be consistent with any psychiatric problems that significantly interfere with the claimant's ability to function on a daily basis." *Id.*

On the same day, Dr. Joyce Graber conducted a consultative internal medicine examination of Bonilla at the request of the Commissioner. R. 208-12. Bonilla reported to Dr. Graber that he had back pain due to scoliosis since childhood, including "pain when he sits for too long or stands for too long." R. 208. He rated his pain a six on a scale of one to ten. *Id.*

---

[9]     The Diagnostic and Statistic Manual of Mental Disorders is used by psychiatrists and clinicians to diagnose mental illnesses. Kendra Cherry, *What is the Diagnostic and Statistic Manual (DSM)?*, About Psychology, http://psychology.about.com/od/psychotherapy/f/faq_dsm.htm. Individuals are evaluated along five different axes to evaluate various areas of functioning. *Id.* Axis I describes clinical symptoms that can cause impairment, such as anxiety and developmental disorders; Axis II describes long-term problems such as personality disorders and mental retardation; Axis III includes physical and mental conditions which may worsen Axis II and II disorders; Axis IV accounts for social and environmental problems that may impact Axis I and II disorders; and Axis V helps a clinician rate a person's overall level of functioning. *Id.*

Bonilla said he could walk but "then has back pain," and that he does not drive. *Id.* In addition, Bonilla stated he had difficulty sleeping and shortness of breath. *Id.* He told Dr. Graber that he had suffered from epilepsy since birth and that his last seizure was three months earlier. *Id.* Bonilla noted that "[h]is seizures do not occur very often." *Id.* He said he had had high blood pressure since 2012. *Id.* Bonilla denied drug or alcohol use. *Id.* He told Dr. Graber that he lived with his sister and did not do any cooking, cleaning, laundry, or shopping. *Id.* He did, however, shower and dress himself daily, and watch television. *Id.* Dr. Graber noted that Bonilla's gait, squat, and stance appeared normal, and that he could rise from his chair without difficulty. *Id.* The doctor reported that scoliosis was present in Bonilla's thoracic spine and that his lumbar spine showed "limited flexion extension to about 10 degrees." R. 210. Bonilla "decline[d] to flex his back further because he report[ed] he will have pain." *Id.* Dr. Graber diagnosed scoliosis, back pain, shortness of breath, seizures, and high blood pressure by history. *Id.* In conclusion, the doctor stated that Bonilla "has a mild limitation for bending," and that he "needs to avoid driving, operating machinery or climbing to any great height due to his history of seizures." *Id.*

On July 15, 2013, Bonilla visited Dr. Yu for a scoliosis follow-up and an SSI referral. R. 249-50. Dr. Yu reported that Bonilla has scoliosis and that "the shoulder is high." R. 249. Bonilla was diagnosed with lower back pain and referred to neurosurgery for a fusion procedure. *Id.*

On August 11, 2013, Bonilla was taken to the emergency room at St. John's hospital. R. 265-66, 309-24. His father reported that Bonilla was drunk and appeared to be having trouble breathing. R. 266. Bonilla's respiratory and neurological systems appeared normal, and he was discharged. R. 309, 315-16.

On January 28, 2014, Dr. Yu filled out a "Medical Source Statement of Ability to Do Work-Related Activities." R. 216-21. Dr. Yu estimated that Bonilla could lift or carry up to ten pounds occasionally (up to one-third of the time) and could never lift or carry more than ten pounds. R. 216. Bonilla, in Dr. Yu's determination, could sit, stand, or walk for a total of four hours without interruption in an eight-hour work day. R. 217. The doctor reported that Bonilla should be able to reach, handle, finger, and feel with both hands continuously (over two-thirds of the time). R. 218. However, he would only be able to push or pull with his left or right hand occasionally. *Id.* Bonilla's right hand is his dominant hand. *Id.* Dr. Yu opined that Bonilla could use foot controls with either foot occasionally. *Id.* Dr. Yu estimated that while Bonilla should be able to climb stairs and ramps occasionally, he could "[n]ever" climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl. R. 219. In addition, Dr. Yu stated that Bonilla should "[n]ever" operate a motor vehicle or be exposed to unprotected heights, moving mechanical parts, or vibrations. R. 220. Dr. Yu reported that Bonilla could not walk for "too long." R. 221. The doctor stated that the limitations to Bonilla's ability likely began in 2007 and had lasted or would last for 12 consecutive months. *Id.* He could perform the following activities: shop, use public transportation, travel on his own, walk without assistance, climb a few steps, prepare a simple meal, care for his personal hygiene, and sort paper files. *Id.*

On April 16, 2014, Bonilla went to Dr. Yu to complete his disability paperwork and to have a wellness exam. R. 400-01. Dr. Yu assessed scoliosis and noted that Bonilla's "shoulder is high." R. 400. Dr. Yu completed a "Spinal Disabilty Questionnaire" on April 19, 2014. R. 384-91. Dr. Yu first examined Bonilla for scoliosis on September 21, 2009; the date of his last exam was April 11, 2014. R. 384. The doctor had diagnosed Bonilla with scoliosis and lower back pain. *Id.* He noted that Bonilla has a limited range of motion, tenderness, and

muscle spasms in his lumbar area. R. 384-85. In addition, Dr. Yu stated, Bonilla has an abnormal gait. R. 385. He could lift both legs to 90 degree angles. *Id.* He also has aching pain in his upper back, which appears daily and affects his movement and emotional well-being. R. 386. Dr. Yu said he prescribed Bonilla 800 mg of Motrin, but there were side effects. R. 388. In an eight-hour work day, Dr. Yu stated, Bonilla could sit for two hours and stand or walk for two hours. R. 387. He found it necessary or medically recommended for Bonilla not to sit, stand, or walk continuously. *Id.* Bonilla would need to move around each hour for five to ten minutes. *Id.* Bonilla complained to Dr. Yu of feeling pain frequently (up to two-thirds of an eight-hour work day), and the doctor characterized the pain as ongoing. R. 389. Dr. Yu stated that he did not find Bonilla to be a malingerer. *Id.* He said Bonilla could not handle even low stress. *Id.* His condition interfered with his ability to keep his neck in constant position, *e.g.*, to look down at a desk or at a computer screen. R. 390. Dr. Yu reported that Bonilla could not withstand full-time employment in a position that requires specific activity on a sustained basis. *Id.* Furthermore, the doctor estimated that Bonilla is likely to be absent from work as a result of his impairments "[a]bout two to three times a month." *Id.*

On June 12, 2014, Bonilla saw Dr. Yu for a scoliosis follow-up. R. 402-03. The doctor wrote him a surgical referral. R. 402. An orthopedic surgeon examined Bonilla on July 16, 2014. R. 407, 411-12. Bonilla stated he had scoliosis and that he was recommended for bracing, but did not follow up. R. 411. In addition, Bonilla told the surgeon that he had a history of seizures, and that his last seizure was three to four years prior. *Id.* Upon physical examination, Bonilla's gait and posture appeared normal, but he had shoulder and scapular asymmetry. *Id.* Imaging showed 59 degree thoracic and 55 degree lumbar curves. R. 412. The surgeon concluded that Bonilla would need surgical stabilization to prevent the progression of

his scoliosis. *Id.* He referred Bonilla for an MRI of his spine, R. 405, and wrote that he would discuss surgical options with him after he received the imaging results. R. 412.

On August 13, 2014, Bonilla appeared for a radiology consultation. R. 405-06. He attempted to have an MRI done, but he could not tolerate the examination. R. 405. The same surgeon mentioned above noted on October 1, 2014 that Bonilla got claustrophobic during his MRI. R. 413. Bonilla had returned for a new referral so he could try again. R. 413. The surgeon stated, "I am awaiting his complete MRI to book him for surgery." *Id.*

On November 18, 2014, Dr. Yu responded to a letter from U.S. Advocates, which appointed counsel to Bonilla's case for his hearing. R. 415-16. He stated that Bonilla "is totally disabled" and that "[d]rug and/or alcohol use is not a material cause of [Bonilla's] disability." R. 416.

D.    *Expert Testimony*

As mentioned above, three experts testified at Bonilla's hearing. They respectively analyzed Bonilla's psychiatric well-being, his physical state, and his ability to work.

First, Dr. Fine testified about Bonilla's psychiatric abilities. R. 44-50. She reviewed the report from Bonilla's consultative psychiatric exam with Dr. Lancer, the results of which "did not appear to be consistent with any psych problems." R. 45. She noted that Bonilla had been hospitalized for alcohol intoxication, but said any issues with alcohol should not interfere with Bonilla's ability to work. R. 45, 47. Regarding Bonilla's seizures, Dr. Fine testified that she did not examine Dr. Yu's records very thoroughly because "it was not in [her] area of specialty." R. 49. Dr. Fine's conclusion was that "the record doesn't indicate that he meets or equals any psych listing." R. 47.

Dr. Eliav[10] next testified about Bonilla's physical health.  R. 50-60.  He stated that Bonilla's scoliosis "is fairly advanced and marked."  R. 54.  The Cobb angle[11] of Bonilla's spine was 53 degrees in March 2012.  *Id.*  At his surgical examination in July 2014, it was 59 degrees. *Id.*  Dr. Eliav explained that less than 30 degrees indicates a mild case of scoliosis; 30 to 45 is a moderate case; and more than 45 degrees, "most will agree is considerable."  *Id.*  Dr. Eliav testified that the progression of the angle in Bonilla's spine "would indicate the likelihood of it getting worse."  R. 60.  In terms of functionality, the doctor said scoliosis often "inhibits the ability to breathe" and "has an effect on function."  R. 55.  Dr. Eliav said Bonilla should be able to lift 30 pounds, but that lifting "would cause problems if it were done on a frequent basis."  *Id.* In addition, he said Bonilla should not lift more than 20 pounds "despite his testimony."  *Id.*  He recommended "less than occasional, less than one-third bending, crawling, ladder climbing, kneeling, crouching, stooping."  R. 56.  Dr. Eliav stated that Bonilla "would be able to sit cumulatively six to eight hours, but he would need a break every hour for five minutes."  *Id.* Additionally, "he would be able to stand up to four hours cumulatively but again require every hour, a five minute break."  *Id.*  Dr. Eliav confirmed that he had read Dr. Yu's chart regarding Bonilla's abilities and stated, "I would respectfully have to disagree with him."  R. 57.

---

[10]     Dr. Eliav's name appears as "Dr. Elliott" in the hearing transcript.

[11]     "To measure the Cobb angle, one must first decide which vertebrae are the end-vertebrae of the curve deformity (vertebrae at the upper and lower limits of the curve) and then [the] Cobb angle [is] formed by the intersection of two lines:
- one parallel to the endplate of the superior end vertebra and
- the other parallel to the endplate of the inferior end vertebra.

The angle may be plotted manually or digitally and scoliosis is defined as a lateral spinal curvature with a Cobb angle of 10° or more."  Ayush Goel and Ahmad Thuaimer, *Cobb angle*, Radiopaedia, http://radiopaedia.org/articles /cobb-angle.

Finally, Mr. Manzi, a vocational expert, opined about Bonilla's prospects to become gainfully employed. R. 60-64. Manzi testified that Bonilla did not have any relevant work experience as his only employment "was short term or there wasn't enough money involved." R. 61. He stated that Bonilla "could do some light work and a pretty large range of sedentary work." *Id.* For example, he could become an assembler of small products, a table worker, an addresser in a mailroom, or take on other jobs with a "sit/stand option." R. 62-63. If, however, Bonilla could work for only four hours per day, experienced pain for two-thirds of the day, or needed to be absent from work two to three times per month, Manzi testified, "there wouldn't be any work" for him. R. 64.

## DISCUSSION

A.      *The Standard of Review*

Under 42 U.S.C. § 405(g), Bonilla has the right to have a district court review "any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy," and the court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." The court can also choose to "remand the case to the Commissioner of Social Security[,]" or, in appropriate cases, to "order additional evidence to be taken before the Commissioner of Social Security." 42 U.S.C. § 405(g).

In reviewing the Commissioner's decision, I must decide if it is supported by substantial evidence and if the correct legal standards were applied. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). To decide this, I examine whether the Commissioner's decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

B.      *The Commissioner's Decision*

1.      *The Standards for Determining SSI Eligibility*

The Act provides that a person is disabled if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." Additionally, an individual is disabled "only if his physical or mental impairment or impairments are of such severity that he . . . cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B); *see also Melville v. Apfel*, 198 F.3d 45, 50-51 (2d Cir. 1999).

The Social Security Administration's regulations prescribe a sequential five-step analysis for determining whether a claimant is disabled:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)) (alterations omitted); *see also* 20 C.F.R. § 404.1520(a)(4)(i)-(v) (setting forth this process). The claimant bears the burden of proof in the first four steps, and the burden shifts to the Commissioner in the last. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

     2.    *The ALJ's Findings*

At step one of the analysis described above, the ALJ found that Bonilla has not engaged in substantial gainful activity since the onset of his disability in December 2012. R. 14. At step two, he found that Bonilla suffers from scoliosis, a "severe impairment" as defined by 20 C.F.R. § 416.920(c). *Id.* The ALJ stated that Bonilla's back pain causes him "more than minimal functional limitations . . . to do basic work related activities on a sustained basis." *Id.* He made no mention of Bonilla's epilepsy or other conditions under step two. At step three, the ALJ found that Bonilla's scoliosis, though "severe," did not meet the criteria of any ailment listed in 20 C.F.R. § 404 Subpart P, Appendix 1. R. 14-15.

Accordingly, the ALJ calculated whether Bonilla, despite his severe impairment, had the RFC to perform work. R. 15-17. He determined that Bonilla has the RFC to "perform light work," as defined in 20 C.F.R. § 416.967(b), except that he can lift or carry only 20 pounds frequently and 30 pounds occasionally. R. 15. The ALJ found that Bonilla could sit for six hours and stand for four hours over the course of an eight-hour day, as long as he could take a break for five minutes every hour in order to change position. *Id.* He could occasionally bend, crouch, and crawl. *Id.*

As for Bonilla's subjective complaints of pain, the ALJ acknowledged that his "medically determinable impairment could reasonably be expected to cause the alleged

symptoms," but nonetheless found that Bonilla's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible. . . ." R. 16.

At step four, the ALJ observed that there was no past relevant work to consider. R. 18. At step five, based on the vocational expert's testimony, he determined that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." *Id.* Those jobs included small product assembler, table worker, and addresser in a mail room. R. 18-19. Pursuant to these findings, the ALJ decided Bonilla is not disabled. R. 19.

C.        *Errors in the ALJ's Decision*

As discussed above, the ALJ's decision was based on his conclusions that Bonilla, despite his impairments, retains the capacity to perform light work, and that his testimony about his symptoms was not credible. These conclusions are not supported by substantial evidence.

1.        *Improperly Calculating Bonilla's RFC*

A claimant's RFC is defined as "the most you can still do despite your limitations." 20 C.F.R. § 416.945(a)(1). It is based on all the relevant evidence in the claimant's record. *Id.* "The ALJ's duty to develop the record includes ensuring that the record as a whole is complete and detailed enough to allow the ALJ to determine the Plaintiff's RFC." *Fernandez v. Astrue*, No. 11-CV-3896 (DLI), 2013 WL 1291284, at *16 (E.D.N.Y. Mar. 28, 2013) (citation omitted). A claimant's RFC should take into consideration her physical abilities, mental abilities, and "other abilities affected by impairment(s)." 20 C.F.R. § 404.1545(b)-(d). "Other abilities" include impairments to "vision, hearing or other senses, and impairment(s) which impose environmental restrictions, [and] may cause limitations and restrictions which affect other work-related abilities." 20 C.F.R. § 404.1545(d).

The ALJ's determination that Bonilla has the RFC to perform "light work" as defined by the Act is not supported by substantial evidence.

First and foremost, despite the ALJ's recognition that Bonilla has "a long-standing seizure" condition supported by ample evidence in the medical record, he did not take into account Bonilla's epilepsy at all in determining his RFC. Considering that Bonilla's seizures are one of the primary bases for his claim of disability, this failure is unacceptable. On remand, the ALJ must both develop the record with respect to Bonilla's seizure disorder and consider the effects of that history – such as the inability to drive and sudden, random absences – on Bonilla's functional capacity.

Second, the ALJ did not ask important questions and follow-up questions to properly evaluate Bonilla's abilities and impairments. For example, the ALJ noted in his decision that Bonilla does not take epilepsy medication, implying that his credibility is suspect. R. 16. Bonilla has indeed stated that he does not take medication for either his seizures or his back pain, but the ALJ never inquired as to *why* that is the case. There could be many reasons, including Bonilla's lack of health insurance, R. 134, or his financial state. Furthermore, Dr. Yu made several notations that Bonilla's physical limitations have an effect on his emotional well-being, R. 386, but the ALJ did not raise this issue during the hearing. The ALJ even stated in his decision that Bonilla was hospitalized for alcohol intoxication after he became "very depressed," but he did not evaluate whether Bonilla's emotional status could affect his RFC. The ALJ must suss out any such information on remand in order to sufficiently develop the record for Bonilla's RFC calculation.

Third, the ALJ's opinion is riddled with mischaracterizations of what was submitted into the record. He wrote that Bonilla testified that he is capable of lifting "40 pounds

with his left hand, 20 pounds with the right hand, and 30 pounds using both hands." R. 15. In fact, Bonilla testified that he could lift 20, maybe 30 pounds with his left hand. R. 32-33. He never testified to being able to lift a specific number of pounds with his right hand – only that he was weaker on his right side. R. 32. In another instance, the ALJ wrote that Bonilla "stated he can sit for 3 hours at a time and after lying down for an hour, he can sit another 3 hours." That was not Bonilla's testimony. Bonilla said he could probably sit for three hours and then take a break and sit for another hour. R. 33. He testified that even with breaks, he could not sit for five or six hours in a day. R. 34.

Additional examples include that the ALJ stated that Bonilla had been referred for back bracing, but "there had been no follow-up," R. 16, without acknowledging that Bonilla said he did not use the brace because it made his pain worse. R. 42. Also, the ALJ's decision notes that Bonilla was "let go" from his job of as a stock clerk with no acknowledgment that he lost that job because his back pain kept him from being able to perform the required tasks. R. 31.

Finally on this point, the ALJ did not take into consideration the effect of Bonilla's impairments on his ability to actually hold on to a job. Bonilla, through counsel, asked the vocational expert if there would be any jobs available to him if he could only work for a total of four hours per day, which was Dr. Yu's determination. Manzi responded that "[t]here would be no work based . . . on that." R. 64. Manzi reached the same conclusion when Bonilla asked him whether he could find a job if he felt pain for two-thirds of the day, or if he had to miss work two or three times a month. *Id.* The ALJ, who relied on select portions of Manzi's testimony, erred by failing to discuss these other considerations as well in making his RFC determination.

The ALJ's calculation of Bonilla's RFC was not properly calculated. On remand, the ALJ must both develop the record more comprehensively and carefully consider all of the facts before determining Bonilla's RFC.

2.      *Declining to Give Controlling Weight to Treating Physician*

The opinion of a treating physician is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c) & 416.927(c); *see, e.g.*, *Halloran,* 362 F.3d at 31-32; *Veino v. Barnhart,* 312 F.3d 578, 588 (2d Cir. 2002). Furthermore, "[e]ven where a treating physician's opinion is not controlling because it conflicts with other medical evidence that might be considered 'substantial,' it is still entitled to significant weight because the treating source is inherently more familiar with a claimant's medical condition than are other sources." *McClaney v. Astrue*, No. 10-CV-5421(JG)(JO), 2012 WL 3777413, at *11 (E.D.N.Y. Aug. 10, 2012) (quoting *Ellington v. Astrue*, 641 F. Supp. 2d 322 (S.D.N.Y. 2009)); *see also Greek v. Colvin*, No. 14-3799, 2015 WL 551526120, at *3 (2d. Cir Sept. 21, 2015) (*per curiam*) (stating that there are circumstances when it is appropriate not to give the treating physician's opinion controlling weight, but the ALJ must consider several factors when deciding what weight to give it, and must comprehensively set forth good reasons for the weight assigned); C.F.R. § 404.1527(c)(2). When a treating physician's opinion is not given controlling weight, the determination of what weight to give it is governed by six factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant.

*McClaney*, 2012 WL 3777413, at \*11 (quoting *Papp v. Comm'r of Soc. Sec.*, No. 05-CV-5695 (AJP), 2006 WL 1000397, at \*11 (S.D.N.Y. Apr.18, 2006) (citing regulation now codified at 20 C.F.R. § 1527(c)(2)-(6)); *see also Greek*, 2015 WL 551526120, at \*3. Guided by these factors, the ALJ must "always give good reasons" for the weight accorded to the treating physician's opinion. 20 C.F.R. § 404.1527(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008). The Second Circuit has consistently held that "[t]he failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Greek*, 2015 WL 551526120, at \*3 (citing *Burgess*, 537 F.3d at 129); *Halloran*, 362 F.3d at 33.

The obligation of the ALJ to accord controlling weight to the treating physician includes the duty to obtain the physicians' assessments of the claimant. *Lawler v. Astrue,* No. 10-CV-3397, 2011 WL 5825781, at \*7 (E.D.N.Y. Nov. 14, 2011) ("An ALJ's affirmative obligation to develop the record also includes the obligation to contact a claimant's treating physicians and obtain their opinions regarding the claimant's residual functional capacity."); *Hardhardt v. Astrue*, 05-CV-2229 (DRH), 2008 WL 2244995, at \*9 (E.D.N.Y. May 29, 2008) ("[T]he ALJ was obligated to ensure that the record was fully developed, which would include obtaining the treating physicians' assessments of [the claimant]'s functioning.").

There is no dispute that Dr. Yu was Bonilla's primary treating physician during the period in question. Dr. Yu treated Bonilla on a monthly basis over the course of at least six years, beginning in 2009. R. 384.

On multiple occasions, Dr. Yu opined that Bonilla's severe back pain and other conditions would interfere with his ability to perform simple work tasks. R. 216-21, 384-91. Combining his medical expertise with his years of observing and treating Bonilla, Dr. Yu has indicated that Bonilla would be able to work for a total of only four hours out of a typical eight-

hour day.  R. 217, 387.  Dr. Yu estimated that Bonilla could "never" lift or carry more than ten

pounds.  R. 216.  In addition, Bonilla's condition does not allow him to keep his neck in a

constant position to look down at a desk or at a computer screen.  R. 390.  Dr. Yu further

indicated that Bonilla would need to take unscheduled breaks in order to change positions.  R.

387.  He would also miss work about two or three times per month due to his impairments.  R.

390.

       The ALJ did not give controlling weight to Dr. Yu's assessments of Bonilla,

instead affording "great weight" to the opinion of Dr. Eliav, who had only examined Bonilla for

a single consultation at the request of the Commissioner.  R. 17.  The ALJ did not give "good

reasons" for departing from Dr. Yu's assessment of Bonilla's abilities, and in fact gave hardly

any reason at all.  He stated only that "Dr. Yu did not cite any objective findings," R. 17, but, as

noted above, the ALJ bears the duty to request and obtain any such findings.

       By giving "great weight" to Dr. Eliav's determination that Bonilla could carry 20

pounds frequently and 30 pounds occasionally, as well as sit for six hours and stand for four

hours in a work day with five-minute breaks, the ALJ ignored the evidence in the record that

supports Dr. Yu's opinions.  Bonilla himself stated that he could not sit for more than four hours

per day and in fact testified that he needs to lay down at various parts of the day.  R. 34.  This

consistent testimony did not play a role in the ALJ's determination of how much weight to give

Dr. Yu's opinion according to factors three and four of the six-factor test described above.

Indeed, the ALJ did not consider any of the six factors in his decision, a defect that in and of

itself warrants a remand.

       While it is true that Bonilla's estimations of how much he could lift or carry are

closer to those of Dr. Eliav, even the expert himself tempered those estimations.  R. 55.  His

opinion of how much weight Bonilla – who admittedly never goes to the gym or works out, R. 32 – could lift or carry were given "despite [Bonilla's] testimony." R. 55. Evidence other than Bonilla's testimony indicates that Dr. Yu's estimation has greater weight. For example, Bonilla lost his job as a stock clerk because he could not lift much and was working too slowly. Furthermore, he reported having difficulty lifting big pots and pans. R. 59. Should the ALJ decide to ignore these and other facts that support Dr. Yu's assessment, he must state "good reasons" for doing so. And should he choose to give less than controlling weight to Dr. Yu's determinations, he must consider the six factors stated above in determining what lesser weight to give them.

Because the ALJ provided little to no reason for ignoring Dr. Yu's assessment of Bonilla's capabilities, a remand for further review is appropriate.

3. *The Adverse Credibility Determination*

An ALJ must assess a claimant's credibility regarding his subjective complaints of pain. *Snell v. Apfel,* 177 F.3d 128, 135 (2d Cir. 1999). The weight assigned to a claimant's testimony in this regard is within the ALJ's discretion. *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir. 1979). However, "the ALJ's discretion is not unbounded." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 280 (S.D.N.Y. 2010). "[T]he subjective element of [the plaintiff's] pain is an important factor to be considered in determining disability." *Mimms v. Heckler,* 750 F.2d 180, 185 (2d Cir. 1984). The ALJ "must assess subjective [testimony] in light of objective medical facts and diagnoses." *Williams ex rel. Williams*, 859 F.2d 255, 261 (2d Cir. 1988). However, "subjective pain may serve as the basis for establishing disability, even if unaccompanied by positive clinical findings or other objective medical evidence." *Donato v. Sec. of Dep't of Health and Human Servs.*, 721 F.2d 414, 419 (2d Cir. 1983) (internal quotations, alterations and citation omitted). If

the claimant's testimony as to pain is not fully supported by clinical evidence, the ALJ must consider additional factors in assessing that testimony: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of symptoms; (3) the precipitating and aggravating factors; (4) the type, dosage, effectiveness and side effects of any medications taken; (5) other treatment received; (6) other measures taken to relieve symptoms; and (7) any other factors concerning the individual's functional limitations due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi) & 416.929(c)(3)(i)(vi).

I am mindful that "[i]t is the function of the [Commissioner], not [a reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983) (alterations added). However, I nevertheless conclude that the adverse credibility determination here is not supported by substantial evidence.

The ALJ agreed that Bonilla's medically determinable impairments could reasonably be expected to cause the symptoms he complained of, but found that Bonilla's assertions regarding "the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." R. 16. But the decision did not actually provide any such reasons or analysis. Nor did it explain what the ALJ meant by finding that Bonilla was not "entirely" credible, that is, what parts of his testimony were believed and what parts were not. One may guess that the ALJ simply found the Commissioner's experts so convincing that Bonilla could not be telling the truth even though his impairment could concededly cause the pain he discussed. If that is the case – or if there is some other basis for the adverse credibility determination – the ALJ must, in fairness to Bonilla and to facilitate reasoned review of his decision, lay out those reasons.

Moreover, there is significant evidence in the record that Bonilla suffers from impairments that are more restrictive than the ALJ's RFC assessment reflects. The medical evidence shows that Bonilla has consistently complained of back pain and the debilitating nature of his seizures. Bonilla has visited Dr. Yu and other doctors dozens of times for scoliosis consultations. *See supra* at 7-14. Doctors have prescribed pain medication and a back brace, R. 42, 388, given him notes to take time off from work, R. 180, and even referred him for back surgery. R. 407, 411-13. The objective medical evidence shows that Bonilla's scoliosis is getting progressively worse. *See* R. 187 (spinal curve at 53 degrees); R. 412 (curve at 59 degrees). In addition, Dr. Graber – after a consultative exam – cautioned Bonilla against driving, operating machinery, and climbing heights due to his propensity for seizures. R. 210. The evidence strongly supports Bonilla's description of his symptoms and the obstacles they present to his ability to become gainfully employed.

CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings is denied and Bonilla's case is remanded to the Commissioner for further proceedings consistent with this decision.

So ordered.

John Gleeson, U.S.D.J.

Dated: October 19, 2015
        Brooklyn, New York